IVER LAWSON *et al.* as Trustees of the Norwegian
Evangelical Lutheran Church of Chicago

*v.*

TORJUS KOLBENSON *et al.*

61     405
110a  7  47

1. PARTIES IN EQUITY—*suit for church property.* Where the minority of a church organization seek to arrest a contemplated or correct an accomplished perversion of the trust under which the church property is

held, the bill should be filed by the persons composing the minority in their individual names; or, if the parties be numerous and all stand in the same situation, having a common right or intererst, then two or three, or more, may sue in their own names for the benefit of all.

2. Same—*church as party.* But when the acts of the trustees, confirmed by a majority of the church, constitute the alleged perversion, then, inasmuch as such trustees and majority of the church represent the corporation, their acts must be regarded as the acts of the corporation, and the corporation is a necessary party, for it would not be bound unless made a party in its corporate character. Hence, if not complainant, it must be made defendant.

3. Certainty—*how far requisite.* It is absolutely necessary that such a convenient degree of certainty should be adopted in the structure of bills in equity as will serve to give the defendant full information of the *case* which he is called upon to answer. The character in which the complainants sue is an essential element of the case, and they will not be allowed to so describe their character as to induce the defendant to suppose that they sue *in autre droit,* and then upon the hearing insist that they have sued as well in their own individual rights.

4. Suit in autre droit—*words describing.* Where the complainants, after setting out their individual names, state the character in which they sue, thus: "as trustees of the Norwegian Evangelical Lutheran Church of Chicago, in their own right and in behalf of the persons hereinafter mentioned, whom, as trustees, they represent," they describe the character in which they sue in the proper language to express that they sue *in autre droit.* It is as trustees, etc., and this is an express limitation to the character thus indicated.

5. Individual rights—*how sued for.* In this case, the words "in their own right" injected into the description of their character, are not equivalent to the words "in their own *individual rights,*" but when considered with reference to the context, must be taken to mean in their own right *as such trustees.*

6. If these complainants had sued as individuals, basing their right upon membership in the church, or upon that of mere *cestuis que trust,* and for the benefit of all other members standing in common interest, they would have presented an entirely different case requiring a different line of defense, and it seems that the entire litigation might then have been disposed of upon a plea setting up their previous expulsion from the church by the ecclesiastical tribunal of the church.

7. Quo warranto—*when necessary.* Where the defendants have been *de facto* elected to a corporate office, have accepted and acted in the same, the validity of their election can only be tried by a proceeding or information in the nature of a *quo warranto.* Nor can the title to an office, in

such a case, be decided in a collateral suit; it must be by a direct proceeding.

8. SAME—*against church trustee.* It is the settled law of this country that an information in the nature of a *quo warranto* will lie against one who intrudes himself into the office of trustee of a church corporation.

9. TRUST PROPÉRTY—*perversion of trust.* Where a deed is to certain persons as trustees of a church by the then name of the Scandinavian Evangelical Lutheran Church of Chicago, and the trust was expressed thus: "For the erection of a house for public religious worship and none other, without the consent of the parties of the first part," it shows that the intention of the parties is, that the premises are to be held in trust for the erection and use of a house for public religious worship, under the ministrations of an Evangelical Lutheran Church, as its essential doctrines and tenets are then promulgated and known, and so long as this is done courts of equity do not interfere on account of inaccuracies of expression or inappropriate figures of speech, nor for departures from mathematical exactness in the language employed in inculcating the tenets of the donors. There must be a *real,* substantial departure from the purposes of the trust, such an one as amounts to a perversion of it, to authorize the exercise of equitable jurisdiction in granting relief.

10. CHURCH INDEPENDENCE—*effect of.* Where a church has a complete legal existence, self-governing in character, before it unites with any synod, and might continue on as it began without being connected with any, and while thus independent acquires a conveyance of lands, and afterwards, by a majority vote of the church, connects and disconnects itself with several synods successively, always maintaining and observing the doctrines, tenets and symbols of the original church, and there is a clear preponderance of testimony that, under the laws, usages and customs of that church, it is competent for a majority of the members to sever the connection with the synod at any time, such a majority loses none of its rights in the property of the church by so doing.

11. SAME—*pastor under sentence.* Where the synod of A, to which such a church then belonged, met on the 20th of March and entered on the trial of certain charges against its pastor, and after a session of three days adjourned to the 24th of April without concluding the trial, and on the 18th of April such church, by vote of a majority of its members, duly withdrew from all connection with the synod of A, and afterwards said synod, meeting on the 24th of April, continued the trial, concluding on the 27th, with a sentence that said pastor be excluded from that synod and from the ministry in the churches belonging to it, such a sentence does not affect this church which did not belong to it.

WRIT OF ERROR to the Superior Court of Chicago; the Hon. JOHN A. JAMESON, Judge, presiding.

408      LAWSON *et al. v.* KOLBENSON *et al.*     [Sept. T.,

Opinion of the Court.

Messrs. HURD, BOOTH & KREAMER, and Mr. C. BECKWITH, for the plaintiffs in error.

Messrs. MILLER, VAN ARMAN & LEWIS, for the defendants in error.

Mr. JUSTICE MCALLISTER delivered the opinion of the Court:

This is a bill in chancery for the equitable adjustment of the temporalities of a religious society. It was exhibited by plaintiffs in error, "as trustees of the Norwegian Evangelical Lutheran Church, of Chicago, in their own right and in behalf of the persons hereinafter mentioned, whom, as trustees, they represent," against ten individuals by name, nine of whom are described as trustees of the same society, and one as the acting pastor thereof. The bill as originally filed, and as amended, goes upon the theory that a majority of the society have seceded from the church as originally established by wrongfully withdrawing from the synod and its government to which the church was subject, and have united with and under another synod and church government of different tenets and doctrines; that, although the nine defendants above mentioned are the trustees of the majority and have retained the pastor, also made defendant, and have the possession and use of the church and its property, yet the secession of the majority from the first mentioned synod, and their retention of the defendant Petersen as their pastor, under the circumstances mentioned in the bill, and forming the connection with the other synod, operated as a perversion of the trust to which the church property was subject, so that equity should intervene for the protection of the minority by declaring that the majority have, by so acting, forfeited all of their rights in and to such property. The prayer of the bill is, that the complainants may be decreed to be the lawful trustees of the church and entitled to the control and possession of the church property for the use of such members as had not so seceded;

that the trustees of the majority be enjoined from pretending they are trustees, or from exercising any control over said property, and be decreed to deliver over the keys of the church, record books, etc., to complainants, and from interfering with the latter and those they represent in the use of the church property, or in administering the government of the society, and for general relief. Issues were formed by answers and replications, the cause was heard upon pleadings, exhibits and proofs, a decree of dismissal of the bill rendered, and the case is brought to this court by writ of error.

The record is exceedingly voluminous, but we will endeavor to compress the material facts into as small a compass as possible.

It appears that, about the 14th of February, 1848, said church was incorporated under the general statute of this State by the name of the "Trustees of the Scandinavian Evangelical Lutheran Church of Chicago." Afterwards, and about the first of June of that year, it united with a synod called the Frankean Evangelical Lutheran Synod of New York. On the 18th of September, 1851, it voluntarily withdrew from the Frankean Synod and united with other churches in forming the Synod of Northern Illinois. On the 1st of October, 1851, a deed was executed by Hosea Webster and wife of lots 24, 25 and 26, in block 13, Butler, Wright & Webster's addition to Chicago. The grantees in this deed are eight persons. The conveyance describes them as trustees of the Scandinavian Evangelical Lutheran Church of the city of Chicago, and runs to them and to their successors in the same office as trustees. The purpose of the conveyance, as declared by the deed, is "for the erection of a house for public religious worship, and none other, without the consent of the parties of the first part." The consideration expressed in the deed was $650, so that the lands were not a donation from Webster, but were purchased by the donations or contributions of members of that and other societies, and in the same manner money was

raised with which to erect the house for public religious wor-
ship upon the premises. The house was erected during the
years 1854–5 and 6. On the 13th of April, 1857, the society
adopted a constitution recommended by a conference of Scan-
dinavian ministers belonging to the Synod of Northern Illi-
nois. At that time the name of the society was changed to
that of "The Norwegian Evangelical Lutheran Church of Chi-
cago." This conference appears to have been an unofficial
body, though its members belonged to the Synod of Northern
Illinois. On the 23d of April, 1860, at a similar conference,
a resolution was passed by the ministers composing it, that
their churches should withdraw from that synod. On the 8th
of May, 1860, the church in question was called upon to act
on that resolution, and it was adopted. The resolution was as
follows: "Resolved, That we, the Norwegian Lutheran
Church of Chicago, which, until this time, has been con-
nected with the Evangelical Lutheran Synod of Northern Illi-
nois, hereby peaceably withdraw from the churchly connec-
tion with the said synod, and that the officers of the confer-
ence reverently communicate to the president of the said synod
the information regarding this our withdrawal."

After having thus withdrawn from two synods, this church
afterwards, and on the 5th of June, 1860, became connected
with a new synod called the Scandinavian Evangelical Lu-
theran Augustana Synod. No circumstances are disclosed
showing this connection to be any more indissoluble in its
nature than that with the Synod of Northern Illinois, or even
that with the Frankean Synod of New York.

Soon after the connection was made with the new synod,
and about the 20th of June, 1860, the Rev. Paul Anderson,
who had been hitherto the pastor of this church, resigned his
pastorate. The cause is not disclosed. In the autumn fol-
lowing, the initiative was taken for calling the Rev. C. J. P.
Petersen, one of the defendants in the bill, to the vacant pas-
torate. He then resided in Norway, and came. On the 15th
of April, 1861, he was formally installed as pastor, and on the

5th of June thereafter he was admitted into the Augustana Synod to which his church then belonged.

The record discloses no want of harmony between him and his people until about the month of June, 1865, when a difficulty arose, which, however, is not traceable to differences in matters of doctrine and conscience so much as to what may justly be termed the ordinary perverse spirit of unregenerate human nature. It appears that the Rev. Paul Anderson, who had formerly been the pastor of the church, but whose relations as such had ceased before the Rev. Petersen's installation, had seen fit to occasionally officiate in the performance of the baptismal and other services within the pale of this church; so that, as the church records show, on the 5th of June, 1865, a church council composed of the deacons and trustees of the church proposed to the church a resolution of censure upon Rev. Paul Anderson for attempting to exercise pastoral functions within the church, baptizing, etc., and affirming that the church would not silently endure its repetition. At a meeting of the congregation or church, held on the 17th of the same month, this resolution was adopted, and which was substantially re-adopted September 20th, 1865.

In December of the same year, arose another cause of difficulty of a similar character. Rev. Hvedding had formerly been an assistant pastor of this church. Certain members, eleven in number, it appears, had caused a petition to be presented to the church council, praying that Rev. Hvedding be allowed to administer the communion service to such members of the church as desired to receive it from him. Upon acting on the petition in the council, several members of that body voted against it. But four deacons, viz.: Lohne, Borke, Nelson and Anderson, voted for it. During all these events Petersen was the regular pastor of the church and in the performance of the duties of his office. Such acts of intrusion and of mischievous tendency were followed by their natural results: dissensions, and calling up the powers of discipline, and this followed by plots and counterplots. Accordingly the

first step was, that, on the 10th of January, 1866, a meeting of the congregation was held, at which the four deacons above mentioned were censured and virtually deposed. The grounds of censure were :

*First*—That they had refused to discipline one B. Olson, a church member, who, in violation of the resolutions of June and September, had caused Mr. Paul Anderson to perform the baptismal service in his family.

*Second*—That they had voted to allow the Rev. Hvedding to perform the communion service in the church at the request of a few disaffected persons, and had refused to protest against his doing so.

On the 8th of February, 1866, the four deacons thus censured preferred charges against the Rev. Mr. Petersen to the president of the Augustana Synod, and that body was convened for the purpose of considering them. It entered upon the trial of Petersen upon those charges, on the 20th of March, 1866, at Chicago. After a session of three days, and on the 23d of March, the synod adjourned to the 24th of April. At the annual meeting of the congregation, held on the 2d day of April, 1866, for the election of officers, the following persons were elected to the offices of deacons and trustees in the place of Iver Lohne, P. Olson, Borke, R. Rasmusson and O. B. Jacobs, whose terms had expired, viz: Torjus Kolbenson and Christian Larsen for three years each, and Hans C. Anderson and O. Jacobs for two years each. At a meeting of the church council on the 9th of April, 1866, Jens Anderson and Jens Nelson were, for unchristian conduct, and particularly for having preferred charges against their pastor before the synod without first having made them to the church council as required by article 3 section 4 of the church constitution, suspended from church membership ; and at a meeting of the church council held on the 16th of the same month, Iver Lohne and Peter Borke were, for a similar cause, suspended from membership with the church.

But on the 6th of April, 1866, fifty of the voting members of the church made a written request upon their pastor, Rev. Mr. Petersen, to call a meeting of the congregation on the 18th of that month to consider the question of the withdrawal of the church from the Augustana Synod, and notice of the meeting was accordingly given from the pulpit on the 8th and 15th of April. At this meeting, by a vote of 145 to 99, the church formally withdrew from the synod by passing the following resolution:

"WHEREAS, This church was organized and adopted its constitution several years before the existence of the Augustana Synod, and has, at different times, transferred its relations from one synod to another; and, whereas, it has become apparent that there is a want of sympathy and harmony between the majority of this church and the Augustana Synod; and, whereas, the Augustana Synod has pursued a course in the treatment of our pastor, the Rev. C. J. P. Petersen, which we deem inconsistent with the constitution of this church, as well as at variance with the dictates of christian charity; therefore,

"*Resolved,* That we hereby withdraw from all connection with the Augustana Synod, with the purpose of remaining a true Lutheran Church, and of connecting ourselves, when convenient, with a true Lutheran Synod."

On the 24th of April, after the adoption of the above resolution, the Augustana Synod convened and proceeded with the trial of the Rev. Mr. Petersen, concluding, on the 27th of the same month, with a sentence that he be excluded from that synod and from the ministry in the churches belonging to it. The synod then appointed two persons, viz: the Rev. Mr. Hattlestadt and the Rev. Mr. Hasselquist, to offer to, and to perform the duties of pastor for said church. But the church denying the right of the synod to impose a pastor upon it, refused to admit the appointees, or either of them; and after the sentence was rendered, but on the same day, the deacons

of the church convened and resolved, in substance, that inasmuch as the church had previously withdrawn from the synod, its prohibition of the Rev. Mr. Petersen officiating as pastor of any church belonging to that synod had no effect as to that church, and, protesting that they had no confidence in the fairness of the synod or the justice of its sentence, resolved that they would request their pastor to continue as such ; but, inasmuch as such a sentence had been pronounced against him, they would have the whole matter reviewed by another synod. Consequently, at a council meeting held on the 3d of May, 1866, and at a congregational meeting held on the 5th of July, same year, it was resolved by the church to apply for admission as a church into the "Norwegian Evangelical Lutheran Synod in America," at which time the Rev. Mr. Petersen, the pastor, also applied for admission to the same synod. Suffice it to say that, pursuant to the application, the charges against Mr. Petersen, made in the Augustana Synod, and the status of the church, were fully investigated in and by the Norwegian Synod. He was exonerated from the charges, and himself and church duly admitted into the latter synod, in which, so far as the record shows, they have ever since remained. The church has continued Mr. Petersen as pastor, and its organization by the proper elections of trustees and deacons, who went into and retained possession of such offices. While the majority that adhered to Rev. Mr. Petersen continued the organization and to worship in the same church after the withdrawal from the Augustana Synod, the minority, consisting of the plaintiffs in error and their adherents, abandoned the church and all further connection with its worship. The church constitution contains the provision, "that if, after admonition, any members of the church shall wilfully absent themselves from public worship for three months, their names shall be stricken out and they shall lose all their right in the real and personal property of the congregation."

Plaintiffs in error and their adherents absented themselves and were duly admonished. Refusing to resume their duties

and continuing to absent themselves from public worship for more than three months, their case was brought before the regularly constituted tribunal of the church, whose decision was, that their names, for the cause aforesaid, should be stricken out and they be excluded from membership of the church. Afterwards, and on the 22d day of April, these ex-communicated persons, and perhaps others, comprising the minority, held a meeting under the following notice :

"The First Norwegian Lutheran Congregation in Chicago hold its annual meeting here, in Pastor Krogness' church (Trinity church) the second day of Easter, April 22d, at two o'clock in the afternoon, when deacons, trustees, and secretary for the congregation will be elected, and also to act upon and decide in other matters of importance to the congregation. All voting members of the congregation are earnestly requested to attend the meeting.

OLE J. HATTLESTADT,<br>*Officiating Pastor, etc.*"

Under this call, and the meeting held thereunder, plaintiffs in error, who had been already excommunicated from the church in question under the authority of the majority, were elected trustees, and on the 27th of the same month filed their certificate in the recorder's office of Cook county, certifying that, on the 22d day of April, 1867, they were elected trustees of the Norwegian Evangelical Lutheran Church of Chicago. The persons so elected having never been admitted into possession of the office, file this bill.

Question has been made in argument in respect to the character in which plaintiffs sued—their counsel maintaining on the one hand that the suit is brought by the persons named as complainants in their own individual right on behalf of themselves and others interested, while, on the other hand, the defendants' counsel insist that the plaintiffs sued *in autre droit;* that they exhibit their bill in an assumed corporate capacity and no other ; that, therefore, they are not entitled to relief in

416 . LAWSON *et al. v.* KOLBENSON *et al.* [Sept. T.,

Opinion of the Court.

their individual characters. The name by which this religious society, made a corporation aggregate under the statute, should sue or be sued, is: The Trustees of the Norwegian Evangclical Lutheran Church of Chicago. R. S. 1845, pages 120 and 121.

When the minority of an association, like the church in question, seek to arrest or correct a contemplated or accomplished perversion of the trust under which the church property is held, the bill should be filed by the persons composing the minority in their individual names; or, if the parties be numerous, and all stand in the same situation, having a common right or interest, then two or three or more may sue in their own names for the benefit of all. 1 Dan. Ch. Pr. 29, 30.

When, however, as here, the acts of the trustees, confirmed by a majority of the church, constitute the alleged perversion, then, inasmuch as such trustees and majority of the church represent the corporation, their acts must be regarded as the acts of the corporation itself, wherefore the corporation is a necessary party, for it would not be bound unless made a party in its corporate character. If the corporation is not complainant it should have been made defendant.

In what character did the plaintiffs sue? The rules of pleading in equity are designed to afford a ready answer to such a question.

"In its modern structure," says Story, "a bill is, or may be, composed of nine parts. The first part is the *direction* or *address* of the bill to the court from which it seeks relief. The second part is the *introduction* which contains the names and description of the parties exhibiting the bill, etc. In this part the names of the parties are not only given, but their places of abode, etc., and *the character in which they sue,* if they sue *in autre droit,* and such other description as is necessary or proper to found the jurisdiction of the court." Story Eq. Pl. sec. 26.

In the second part of this bill the plaintiffs, after setting out their individual names, state the character in which they

sue, thus: "As trustees of the Norwegian Evangelical Lutheran Church of Chicago, in their own right, and in behalf of the persons hereinafter mentioned, whom, as trustees, they represent."

It is a rule that a *sole* corporation suing for a corporate right, having two capacities, a natural and a corporate, must always show in what right he sues. Bac. Abr. Corporation E. 2; *Weston* v. *Hunt*, 2 Mass. 500.

The plaintiffs described the character in which they sued, in the proper language to express that they sued *in autre droit.* It is *as* trustees, etc. This is an express limitation to the character thus indicated. Such is the rule at law. *Douglas* v. *Islam*, 8 Term R. 416; *Rogers* v. *Jenkins*, 1 Bos. & Pul. 383; 1 Chit. Pl. 252; and substantial reasons are perceived why it should be the rule in equity. It is absolutely necessary that such a convenient degree of certainty should be adopted in the structure of bills in equity as will serve to give the defendant full information of the *case* which he is called upon to answer. The character in which the plaintiff sues is an essential element of the case, and plaintiffs will not be allowed to so describe their character as to induce the defendants to suppose that they sue *in autre droit*, and then upon the hearing insist that they have sued as well in their own individual right. The words, "in their own right," injected into the description of their character, are not equivalent to the words "in their own *individual* rights;" but, when considered with reference to the context, must be taken to mean in their own right *as such trustees.*

If they had sued as individuals, basing their right upon membership of the church or upon that of mere *cestuis que trust*, and for the benefit of all other members standing in common interest, they would have presented an entirely different *case*, requiring a different line of defense. Then, perhaps, the entire litigation could have been disposed of upon a plea setting up their previous expulsion from the church by the ecclesiastical tribunal of the church.

27—61ST ILL.

418          LAWSON *et al. v.* KOLBENSON *et al.*     [Sept. T.,

Opinion of the Court.

The entire theory of the case made by the bill as originally filed, is, that the plaintiffs are the lawful trustees of the corporation because elected by those who adhered to the Augustana Synod, and because the majority who withdrew ceased to be of the church corporation by reason of their secession.   It is upon the theory that plaintiffs, in their corporate capacity, were vested with the legal title to the church property ; were lawfully entitled to its control, and to the control of all the temporalities and spiritualities of the church ; that the trustees of the majority, who were in possession and control of the church and its property, were virtually usurpers.   Hence the court was asked to compel the latter to pass over the key of the church to plaintiffs, transfer over to them the church property, records, etc., and to restrain them from pretending that they were the trustees of the church.

By the amendments of the bill the plaintiffs did not profess to change it in respect to the character in which they sued, but only alleged certain changes of tenets and doctrines on the part of the majority, specifying what they were, as a further ground for the relief asked in the original bill.

It is the settled law of this country that an information in the nature of a *quo warranto* will lie against one who intrudes himself into the office of trustee of a church corporation. Ang. & Ames on Corp. 9th Ed. 751. The defendants had been *de facto* elected to a corporate office, had accepted and acted in the same.   In such case, the validity of their election could only be tried by a proceeding on information in the nature of *quo warranto.*   Nor can the title to an office, in such case, be decided in a collateral suit ; it must be by a direct proceeding.     *Baker et al.* v. *Backus,* 32 Ill. 79, and cases cited ; *Regina* v. *Chester,* 34 Eng. L. & Eq. 59 ; *Conover* v. *Devlin,* 24 Barb. 587 ; *Mayor, etc. of New York* v. *Conover,* 5 Abbott Pr. Rep. 171 ; *North Baptist Church* v. *Parker,* 36 Barb. R. 171. In this last case it was held that, persons claiming to have been elected to the office of trustees of a religious corporation,

the title to the office being disputed, and who have not obtained actual possession of the records and property of the corporation, and whose right to the office has not been determined by competent authority, have no right to use the name of the corporation in the suit against the trustees. *de facto* to recover possession of the property of such corporation; and it was further held that, in a suit in the name and behalf of the corporation, the title to the office of trustees of such corporation can not be put in issue or litigated and determined.

It may be said that this was not a suit on behalf of the corporation, because the alleged trustees were named by their proper names. This fact does not change the character of the parties.

When the warden and fellows of Manchester college filed a bill in equity for titles in their corporate capacity, but in their proper names, in which a decree was pronounced from which both the plaintiffs and defendants appealed, and pending the appeal two of the fellows died, two new fellows were elected in their place, and an objection was taken on the ground that the new fellows were not parties, Lord ELDON held that there was no defect of parties because the parties named had sued in their corporate capacity, although it would have abated if the suit had been by them in their individual characters. *Blackburn* v. *Jepson*, 3 Swanst. 138. So here, if some of the plaintiffs had died pending the suit, and before decree, the suit would not have become defective by their death, although it would have abated if the suit had been by them in their individual characters, except so far as saved by the 40th section of the chancery act; (R. S. p. 98;) and in such case, would it be contended that there was either necessity or propriety in reviving under the statute in the name of legal representatives? Sec. 1 Daniell Ch. Pr. 27.

But, waiving this question and assuming that the plaintiffs sued in their individual capacity, and we are of the opinion that they have failed to make out a case for relief.

420        LAWSON *et al.* v. KOLBENSON *et al.*        [Sept. T.,

Opinion of the Court.

The deed was to certain persons as trustees of this church by the then name of the Scandinavian Evangelical Lutheran Church of Chicago, and the trust was expressed thus: "For the erection of a house for public religious worship, and none other, without the consent of the parties of the first part."

The deed, taken altogether, shows that the intention of the parties was, that the premises were to be held in trust for the erection and use of a house for public religious worship under the ministrations of an Evangelical Lutheran Church. The church was organized at the time, and its essential doctrines and tenets promulgated and known. To those we must look to ascertain the nature of the trust.

In *Happy et al.* v. *Morton et al.* 33 Ill. 407, Mr. Justice Beckwith, delivering the opinion of the court, said: "Courts of equity will exert their powers to prevent a misuse or an abuse of charitable trusts, and especially trusts of a religious nature, by trustees or by a majority of a society having possession of the trust property; but in all cases the trust and the abuse of it must be clearly established in accordance with the rules by which courts are governed in administering justice. * * Courts of equity do not interfere on account of inaccuracies of expression or inappropriate figures of speech, nor for departures from mathematical exactness in the language employed in inculcating the tenets of the donors. There must be a *real, substantial* departure from the purposes of the trust, such an one as amounts to a perversion of it, to authorize the exercise of equitable jurisdiction in granting relief."

Tested by these rules, we are of the opinion that the plaintiffs have failed to make out a case on the ground of departure from the purposes of the trust.

The church has ever been, since its withdrawal from the Augustana Synod, as really and substantially an Evangelical Lutheran Church as it was at the time of the conveyance of the property to it.

There is, therefore, no right to any relief on that ground.

The only other grounds are :

*First*—The withdrawal from the Augustana Synod.

*Second*—The retention of pastor Petersen after that synod had pronounced sentence against him.

First, then, as to the withdrawal from the synod: We are unable to perceive how that act should operate as a perversion and afford ground of forfeiture on the part of the majority. The church did not belong to that synod at the time the property was conveyed, but to the Northern Illinois Synod. If the relation is indissoluble then the church still belongs to the latter synod; but it seems that it was terminated in the same way as it was with the Augustana Synod, and in this the minority acquiesced.

This church organization is unlike those of other denominations, where they can not exist at all except in subordination to a higher and controlling organization. This church had a complete legal existence, self-governing in character, before it united with any synod. It might have continued on as it began without being connected with any synod, and acquired a conveyance of lands in the same way as it did. Yet, so long as the church maintained and observed the doctrines, tenets and symbols of the Lutheran church, it would have been entitled to be regarded by other churches of the same denomination as orthodox, and to continue to use the trust property free from the interference of the civil courts. This conclusion is arrived at from a consideration of the testimony in the cause delivered by learned and reverend gentlemen of the Lutheran persuasion in respect to the laws, usages and customs of the church, and there is a clear preponderance of evidence in favor of the views of the defendants, and by which views their action seems to have been governed as well as that of a majority of the church, to the effect that, under such a connection as that with the Augustana Synod, it was competent for a majority of the church to sever the union at any time, and that they lost none of their rights in the property of the church by so doing, and we may add that the prior

practices of the church are strongly corroborative of the theory.

If, therefore, the majority had the right to sever their connection with the Augustana Synod; and exercised it on the 18th of April, the sentence of that body on the 27th prohibiting the Rev. Petersen from officiating as pastor of any church belonging to that synod, would not affect this church, which did not belong to it.

Upon the whole case, we are of the opinion that the decree of the court below dismissing the bill should be affirmed.

*Decree affirmed.*