### E. B. Blinn et al. v. George W. Riggs et al.

1. CHANCERY PRACTICE—*When Court of Chancery Has No Jurisdiction to Try the Title to Office.*—A court of chancery has no jurisdiction to try title to office upon a bill filed for that purpose, the proper remedy being by *quo warranto.*

2. SAME—*Court of Chancery May Determine Who Are Proper Officers Incidentally to Giving of Other Relief.*—A court of chancery may determine who are the proper officers by way of affording incidental relief where it has jurisdiction upon other grounds.

3. CORPORATIONS—*Personal Interest of Stockholder Not to Preclude His Voting on Any Measure.*—Each stockholder represents himself and his own interests only, and his right to vote upon any measure is not in any way affected by the fact that he has a personal interest therein different or separate from that of the other stockholders.

4. SAME—*Right to Vote Stock is Prima Facie in Owner, According to the Books of the Corporation.*—The right to vote corporate stock is *prima facie* in the person who has the legal title as shown by the records of the corporation.

5. SAME—*Insurance Company May Open Office and Do All Business Except Issuing Policies, Without Making Deposits Required by Section 180 and 181, Ch. 73, R. S.*—The organization of an insurance company under the act of 1869 is complete for all purposes except issuing policies, when its charter has been filed as required by statute and approved by the attorney-general, and its capital stock subscribed and directors elected.

**Bill for an Injunction.**—Appeal from the Circuit Court of Cook County; the Hon. EDWARD F. DUNNE, Judge presiding. Heard in the Branch Appellate Court at the March term, 1903. Affirmed. Opinion filed October 9, 1903.

This is a contest between two sets of stockholders of the Mutual Life Insurance Company of Illinois. One set was enjoined and appeals. The injunction was issued upon a bill alleging in substance, as follows:

The company was organized August 30, 1901, under the act of 1869, with a capital stock of $500,000, divided into 5,000 shares of $100 each. After the stock had been fully subscribed, by-laws were adopted, and nine trustees elected. At a meeting of the trustees held February 21, 1902, six additional trustees were elected, and the entire capital stock was turned back into the treasury of the company in order that a part of it might be re-issued and sold for $200 per share, instead of its par value. In consideration of returning the stock, the obligations of the original sub-scribers were canceled, and the stock divided into the following series:

Series No. 1, consisting of 1,500 shares, to be sold at not less than $200 a share.

Series No. 2, consisting of 3,000 shares, to be set aside and issued to holders of Series No. 1 at not less than $200 per share and at not less than book value, in payment of dividends that might be declared on Series No. 1.

Series No. 3, consisting of 500 shares, to be used and sold on recommendation of the majority of the board of trustees, either to provide additional assets or liquidate the obligations of the company.

The foregoing plan of organization was intended, in case it could be successfully carried out, to give the company a paid-up capital of $150,000 in cash, and a cash surplus of $150,000, which would enable the company to obtain a favorable start in the insurance world, and provide ample working capital to carry on its business in a vigorous and successful manner.

The organization and equipment of the company was largely due to the efforts of one of the complainants, George W. Riggs, who, at the time of the organization of the company, was one of the general managers of the New York Life Insurance Company, having charge of one of the main offices of said company in Chicago, and who had held his position as general manager thereof for a period of over nine years next preceding. Believing that Chicago and the west offered a promising field for the organization of a strong standard life insurance company, said Riggs decided to organize the complainant company, to resign his position as general manager of the New York Life Insurance Company, which he did on December 31, 1901, and devote his entire time thereafter to building up the new company.

At this time, February 21, 1902, not to exceed 100 shares of stock had been subscribed for at $200 per share, and further subscriptions were refused unless the assurance could be given that sufficient funds would be raised within a year, to permit the company to engage in the insurance business in Illinois, and also the further assurance that no part of the funds subscribed and paid into the company would be used to pay its current expenses; and that in default of the company being admitted to do business

within a year, the money so subscribed, together with all interest accumulated thereon, should be returned to the respective subscribers.

Thereupon Riggs agreed with those about to subscribe, and with the stockholders and trustees, that unless the company should be so admitted within twelve months the money of the subscribers should be returned.

Accordingly it was agreed that in consideration of his services to the company since the date of its organization, August 30, 1901, his disbursements for incorporation fees, office rent, clerk hire, stationery, postage, and all other expenses of the company up to May 1, 1902, Riggs should receive 250 shares of Series No. 3 stock of the company.

After the passage of this resolution on February 21st, Riggs devoted himself to the affairs of the company, preparing and completing the necessary equipment of forms, tables, computations, blanks, policies, agreements, and in short, a general insurance office equipment; employed at his own expense legal counsel, insurance actuaries, devoted himself to the organization of an agency staff preliminary to entering other states, helped to secure subscriptions to Series No. 1 at $200 a share, all with the result that on or about October 1, 1902, the company had sufficient funds to make its deposit of $100,000 with the insurance department of the state and was practically ready to begin business.

October 1, 1902, a special meeting was held at which a president, vice-president and second vice-president were elected to hold office until the annual election, March, 1903. Riggs was elected president. The treasurer at this time was E. C. Brainard.

At a trustees' meeting held October 10, 1902, it appeared from the treasurer's report that all of Series No. 1 stock had been subscribed for at $200 a share; $159,910.96 had been paid in, and notes given for the balance, $140,099.04. Nine trustees, including the president, were, in pursuance of the charter, elected an executive committee with the same power and authority as the board of

trustees. The board was increased to twenty-five members. Of these, eight are appellants.

At a meeting of the executive committee held October 17, 1902, the salaries of the officers were fixed and it was ordered that the company issue twenty-five shares of No. 3 stock to H. S. Duncombe in full for services as general counsel to April 1, 1903; that forty-eight shares of No. 3 stock issue to E. C. Brainard for his commission in selling 240 shares of No. 1 stock at $200 per share, and that 152 shares of No. 3 stock issue to two other persons for a like commission. It was further ordered that the company issue 250 shares of No. 3 stock to said Riggs in full payment of his services and expenses from the date of incorporation to May 1, 1902, as per contract with the board of trustees under the resolution passed February 21, 1902, it being further understood that Riggs should make no claim for services from May 1, 1902, to October 1, 1902.

Afterward a controversy arose among some stockholders and trustees in regard to the action of the executive committee in issuing 475 shares of Series No. 3 of the capital stock as above set forth. The matter was referred to a committee of five of whom Riggs was one. Four of the committee reported to the trustees that if the stock known as Series No. 3 could be returned to the treasury of the company and canceled, the company should issue a stock dividend of 500 shares of which 190 shares should go to the then owners of Series No. 3 stock, and 310 shares to the owners of Series No. 1 stock. Riggs submitted a minority report recommending that the entire series of No. 2 stock be issued to the holders of the Series No. 1 stock when the net assets of the company should reach $500,000, and that until that time no dividends of any kind should be paid on No. 3 stock.

At a meeting of the trustees held March 20, 1903, at which sixteen trustees, including seven of appellants, were present, the minority report was adopted by a vote of eleven to five.

The first annual meeting of the stockholders was held

March 30, 1903. One thousand four hundred and seventy-five shares of No. 1 stock and 460 shares of No. 3 stock were present in person or by proxy. A resolution was presented, reciting that the No. 3 stock issued to Riggs, Duncombe and others was practically a gift; that it had been wrongfully and improperly issued; that the company had received no further consideration therefor than alleged organization services; that the issue of this stock reduced the value of No. 1 stock from $200 to $150 a share, and amounted to the payment of $75,000 for alleged promotion services; and resolving that the officers of the company be directed to recall and cancel the certificates, not to issue them for less than $200 a share, and that any claims thereafter presented for services or disbursements be audited and allowed in such amounts as the board might consider reasonable and just compensation for the services rendered, and no more.

When this resolution came to a vote, the chairman refused to allow any of No. 3 stock to vote on the question. Upon appeal from this ruling, he would not let any holders of said stock vote on the appeal, in each instance against their objections and protests. The chairman declared that his ruling was sustained, but it would not have been sustained if No. 3 stock had been allowed to vote. The resolution was then voted on, and the records show it was defeated; but the chair declared it carried by throwing out votes of No. 3 stock. A vote was then taken with the same effect on a motion to exclude No. 3 stock from voting for trustees. The stockholders proceeding to vote on the election of trustees, the chair declared the twenty-five elected who had not received the votes of No. 3 stock, and refused to recognize the election of six who would have received the highest number of votes cast if No. 3 stock had been counted. This action of the chair was again objected to and protested against. Complainants further allege that there was a tie vote as to ten candidates; that in consequence only twenty trustees were elected, instead of twenty-five, and that out of the twenty-five declared elected, twelve were in fact not elected.

Subsequently some of the stockholders held several informal conferences with a view of adjusting all matters in dispute and referring them to three arbitrators, which proposition was still pending to the knowledge of the defendants, when, on Friday, May 29, 1903, a notice signed by them to the effect that a meeting of the board of trustees of the company would be held at its office Monday, June 1, 1903, at 3 P. M., was mailed to complainant Riggs, president of the company, at 3:30 P. M. on said Friday; that the next day, May 30th, was Decoration Day, the next day Sunday, and the following day, June 1st, election day; whereupon said Riggs consulted counsel and was advised that said notice was illegal and that certain of the persons signing it were not trustees, and to refuse them admission to the office of the company.

Upon being refused admission the signers of the notice, assembling at some other place, pretended to act as the board of trustees, to elect other officers in place of those holding office with the exception of E. C. Brainard, treasurer, and to pass resolutions revoking the authority of the president and secretary to open deposit boxes of the company and conferring such authority upon said Brainard. Said signers also undertook to revoke the authority of the president, vice-presidents, secretary and cashier to sign checks of the company, and caused copies of the resolutions signed by the defendant McLaren, pretending to act as secretary, to be sent to the Deposit Vault Company and to the banks below named with which the complainant company had its moneys on deposit as follows: At the First National, for payment of current expenses, $1,974.27; at the American Trust and Savings, $2,192.09, subject to the orders of the officers of the company, as provided by its by-laws, and $519.84 at the National Bank of North America, subject to the order of the company's cashier.

Each of said banks notified the company that by reason of the serving upon them of said papers they would not pay out any of its funds deposited with them. Under resolutions of the trustees it was the duty of its officers to deposit in

said banks all moneys received. Various checks, issued by the company in payment of its current obligations and expenses, one of them for payment of the June rent of its offices, were refused by said banks and returned unpaid to the company by reason of the serving of said papers, and it is left without funds to pay its rent, employes and current expenses. Certain sums are due its agents in other states for commissions, disbursements and expenses. Unless the company can release and make available its funds for carrying on its business, it and its stockholders must suffer great and irreparable injury, and its business and reputation will in a short time be wholly ruined.

Since beginning to issue policies January 1, 1903, it has issued about 500 in the sum of about $1,000,000, and has received cash premiums therefrom of over $25,000. It has been prospering in its business and now has cash assets in the sum of $275,000, all on deposit with insurance department of the state in the boxes of said Deposit Vault Company and in said banks, but now wholly inaccessible by reason of the premises.

No demand in writing, as required by the by-laws, for meeting of the trustees of the company, was made upon complainant Riggs as president, and said pretended meeting of the signers of said notice was illegal, and they are not the trustees of the company, and said pretended officers are not its officers.

It is further charged that the defendants have conspired and confederated together with the purpose and intent to involve the company in litigation, and hinder and destroy its business, and, to accomplish this purpose they have acted as aforesaid; that said persons, and each of them, well knew that upon the delivery of said papers to said banks and Safe Deposit Company, the said banks would stop payment of the checks of the company, and said Safe Deposit Company would refuse the company access to its securities, and that said persons intended that said banks and said Safe Deposit Company should do so, and well knew that the effect of delivering such papers as aforesaid,

Blinn v. Riggs.

would be to tie up all of the funds of the company and leave it without available funds for meeting its current expenses, and would necessitate its bringing suit in order to release its funds and carry on its business as heretofore. Said persons, and each of them, well knew at the time of the acts aforesaid, that the bringing of a suit in which the company or its stockholders would be involved, would greatly hurt and injure the business of the company; that for a period of several months last past, said persons have conspired and confederated together with the intent and purpose of getting possession and control of said company, and electing certain of themselves officers, and not being able to accomplish this in a fair and legal manner, proceeded in the way hereinbefore set forth, to gain control of the company, to cripple and destroy its business by throwing it into litigation, with the purpose of eventually securing the control of the company through such means. The company has been legally admitted and authorized by their respective insurance departments to do business in the following ten states: Illinois, Iowa, Minnesota, Michigan, Indiana, Ohio, Pennsylvania, Tennessee, West Virginia and Georgia; that in said states it has various agencies established, and in the opening and conducting of said agencies it is necessary for the company at first to disburse considerable sums of money for agency expenses and the maintenance of its offices, which in a short time, upon the establishment and growth of its business, become sources of profit and revenue to the company, but that at present it is obliged to make remittances from week to week to several of said agencies, for the purpose of meeting their current expenses, and in accordance with its contracts with its agents located in said states. Since June 1, 1903, it has had no funds available for this purpose or to meet the current expenses, and inquiries are arising as to why remittances have not been made as heretofore, and demands are being made for the payment of current bills, and unless an immediate release of its funds is obtained, the company will be obliged to cease doing business.

The complainants in the aggregate own 181 shares of stock of Series No. 1 and 339 shares of Series No. 3. Several of them are holders of policies issued by the company. The prayer of the bill is that certain defendants be immediately enjoined from acting as officers of the company or from interfering with its present officers in the discharge of their duties, and that certain defendants be immediately, and without notice, enjoined from acting as trustees of the company or from interfering with the present officers of the company in the discharge of their duties; that the National Bank of North America be directed to pay out, on the check of the company, signed by the cashier of said company, any funds of said company now or hereafter on deposit with said bank, and that the American Trust and Savings Bank and the First National Bank of Chicago be directed to pay out, on the check of said company, signed by the proper officers of the company, any funds of the company, and that the Merchants' Loan and Trust Safe Deposit Company be directed to give George W. Riggs as president, and Gustav W. Weippiert as secretary of said company, the same authority to open the private boxes of said company in the vaults of said Safe Deposit Company that they have heretofore enjoyed; and that upon a final hearing of this cause, said injunction be made perpetual.

Upon the filing of the bill an injunction issued as prayed, and the defendants appeal from the order granting it.

BULKLEY, GRAY & MORE and HERBERT S. DUNCOMBE, attorneys for appellants.

Equity has no jurisdiction to determine the title to a corporate office. Kean v. Union Water Co., 52 N. J. Eq. 814; Hughes v. Parker, 20 N. H. 72; Owen v. Whitaker, 20 N. J. Eq. 124; Perry v. Tuskaloosa Cotton Seed Oil Co., 93 Ala. 372; Jenkins v. Baxter, 160 Pa. St. 199; C. La F. & C. R. R. Co. v. D. & V. Ry. Co., 75 Ill. 113.

LYMAN, BUSBY & LYMAN, EDWARD O'BRYAN and W. N. MARSHALL, attorneys for appellees.

While a court of equity will not take jurisdiction of a

case, merely to determine the title to a corporate office, yet, where the court has jurisdiction on other grounds, as the prevention of irreparable injury or waste, it may also determine, as incidental to the main relief, the question as to who are the proper officers or directors. Clark and Marshall, Private Corporations, Vol. III, pp. 1988, 2045; Chicago Macaroni Co. v. Boggiano, 202 Ill. 312; Garmire v. American Mining Company, 93 Ill. App. 331: Johnston v. Jones, 23 N. J. Eq. 216.

MR. JUSTICE STEIN delivered the opinion of the court.

· First. A court of chancery has no jurisdiction to try title to office upon a bill filed purely for that purpose, the proper remedy being by *quo warranto*. Kean v. Union Water Co., 52 N. J. Eq. 813; Perry v. Oil Co., 93 Ala. 372; Jenkins v. Baxter, 160 Pa. St. 199; Lawson v. Kolbenson, 61 Ill. 405.

But as was held in Chicago Macaroni Co. v. Boggiano, 202 Ill. 312, and Garmire v. Mining Co., 93 Ill. App. 331, the court may determine who are the proper officers by way of affording incidental relief where it has jurisdiction upon other grounds. That the bill at bar presents such a c ise, appears from the foregoing statement. The acts of the defendants resulted in tying up the funds of the insurance company and prevented it from doing business and meeting its obligations. Excepting banks, no reputation is more sensitive than that of a life insurance company. Had the state of things continued which existed when the injunction issue, the reputation and business of the company would have been ruined, and irreparable injury would have resulted to it and its stock and policy holders.

Second. If the holders of No. 3 stock had a right to vote, the defendants were not elected trustees of the company and had no right to do what they did. Conceding that stock must be fully paid for before the holder of it is entitled to participate in elections for trustees, it does not appear on the face of the bill that the shares of stock in question were not paid for. On the contrary, it appears that the executive committee ordered the stock to issue

upon what it deemed an adequate consideration; and there is nothing before us from which we can determine that the consideration was inadequate or that the transaction lacked in good faith. Nor was there any increase of stock in the issue. All the stock originally subscribed had been placed in the treasury of the company and divided into three series. Series No. 3 was "to be used and sold on recommendation of the board of trustees, either to provide additional assets or liquidate the obligations of the company." The stock was so issued out of the treasury for the latter purpose.

Third. The chairman of the stockholders' meeting rejected the votes of the holders of No. 3 stock on the ground that they were interested in the then pending questions relating to the issue and validity of the stock. In so ruling the chairman erred. Each stockholder represents himself and his own interests only, and his right to vote upon any measure is not in any way affected by the fact that he has a personal interest therein different or separate from that of the other stockholders. Gamble v. Water Co., 123 N. Y. 91; Bjorngaard v. County Bank, 49 Minn. 483; 3 Clark & Marshall on Priv. Corp., 2005; 2 Cook on Corp. (4th Ed.), 1319.

At the time of the election the stock stood in the names of the persons offering to vote it. The right to vote corporate stock is *prima facie* in the person who has the legal title, as shown by the records of the corporation. 3 Clark & Marshall on Priv. Corp. 1993.

Fourth. Whether, at the time the resolution was passed and the contract made under which the No. 3 stock was issued, the company was sufficiently organized and had a sufficiently legal existence to enable it to make a valid contract of that kind, is a question not entirely free from difficulty. The statute (Hurd's Rev. Stat. of 1901, Ch. 73, Sec. 176) provides:

" Before any life insurance company goes into operation under the laws of this state, a guarantee capital of at least $100,000 shall be paid in money and invested in the stocks of the United States * * * or in such other stocks

and securities as may be approved by the auditor of public accounts," etc.

Secs. 180 and 181 are as follows :

" No policy shall be issued until a certificate from the auditor has been obtained authorizing such company to issue policies.   *   *   *

" Whenever the corporators shall have fully organized such company, and the said company shall have deposited with the auditor the required amount of capital, it shall become his duty to furnish the corporators with a certificate of deposit, which, with the certified copy of such declaration, previously received from the auditor, when filed for record in the office of the recorder of deeds in the county where such company is to be located, shall be the authority to commence business and issue policies, and the same, or a certified copy thereof, shall be evidence in all suits."

The above provisions were clearly enacted for the benefit of policy holders; and while in the bill before us there is no allegation that the deposit required by the statute was ever made, or a certificate of deposit furnished and filed, it by no means follows from such failure that the company had no power to issue the No. 3 stock and enter into the contract in pursuance of which it was done. Under the act of 1869 the organization of the company is complete for all purposes except issuing policies when the following things have been done : first, a charter filed as required by Sec. 178; second, the approval of the charter by the attorney-general; and, third, the subscription of its capital stock and election of directors. It may then proceed with the collecting of subscriptions, opening offices, preparing forms and policies and taking steps toward completing its general equipment for enabling it to issue policies as soon as the deposit shall be made.

Appellants raise no objection to the release of the original subscribers to the capital stock and the turning in of the same into the treasury of the company, and we do not wish to be understood as expressing any opinion in that regard.

The order appealed from is affirmed.