Sheabeb, J.
Under the issues presented by the above quoted pleadings a large amount of testimony, oral and documentary, has been introduced ; and without entering into an analysis of the evidence, we, in compliance with the request of counsel, state our conclusions of fact found, separately from our ■conclusions of law, as follows :
That at the commencement of this action the Church of the United Brethren in Christ was a duly organized religious soci *97 ety in the United States, governed by official boards, quarterly conferences, Annual Conferences, and a General Conference, the latter being the supreme legislative, judicial and executive .authority of the church.
That said church was organized some time in the latter part of the eighteenth century ; but no General Conference of the church was held until the sixth day of June, 1815, when such General Conference met at Mfc. Pleasant, Pennsylvania.
That at said General Conference a Discipline, in which was embodieda Confession of Faith, wasadopted. This Discipline was printed wholly in German, and it was not until 1819 that a translation from the German was made, and in that year a Discipline in English was published in which the Confession of Faith appeared as follows':
In the name of God we declare and confess before all men, that we believe in the only true God, the Father, Son and Holy Ghost; that these three are one — the Father in the Son, the Son in the Father, and the Holy Ghost equal in essence or being with both; that this triune God created the heavens and the earth, and all that in them is, visible as well as invisible, and furthermore sustains, governs, protects, and supports the same.
We believe in Jesus Christ; that he is very God and man; that he became incarnate by the power of the Holy Ghost in the Virgin Mary and was born of her; that he is the Savior and Mediator of the whole human race, if they with full faith in him accept the grace proffered in Jesus; that this Jesus suffered and died on the cross for us, was buried, arose again on the third day, ascended into heaven, and sitteth on the right hand of God, to intercede for us ; and that he shall come .again at the last day to judge the quick and the dead.
We believe in the Holy Ghost; that he is equal in being with the Father and the Son, and that he comforts the faithful, and guides them into all truth.
We believe iu a Holy Christian Church, the communion of saints, the resurrection of the body, and life everlasting.
We believe that the Holy Bible, Old and New Testaments, is the word of God; that it contains the only true way to our salvation; that every true Christian is bound to acknowledge *98 and receive it with the influence of the Spirit of God, a» their only rule and guide; and that without faith in Jesus Christ, as also true penitence, forgiveness of sins, and following after Christ, no one can be a true Christian.
We also believe that what is contained in the Holy Scriptures, to-wit: the fall in Adam and the redemption through Jesus Christ, shall be preached throughout the world.
We further think that the outward means, namely : baptism and the remembrance of the sufferings and death of our Lord Jesus, are to be in use, and practiced in all Christian societies ; and that it is incumbent on his fchildren particularly to practice them; but the manner in which ought always to be left to the judgment and understanding of each. So also the practice or example of washing the feet must remain free to the judgment of everyone.
This Confession of Faith was never submitted to the membership of the church for ratification, but by virtue of its adoption by said General Conference became the Confession of Faith of said church; some changes were made in this Confession of Faith by subsequent General Conferences, and in the Discipline of 1841 there was printed what is known in this litigation as the Old Confession of Faith, which is as follows :
In the name of God we declare and confess before all men, that we believe in the only true God, the Father, the Son, and the Holy Ghost; that these three are one — the Father in the Son, the Son in the Father, and the Holy Ghost equal in essence or being with both; that this triune God created the heavens and the earth, and all that in them is, visible as well as invisible, and furthermore, sustains, governs, protects, and supports the same.
We believe in Jesus Christ; that he is very God and man; that he became incarnate by the power of the Holy Ghost in the Virgin Mary, and was born of her; that he is the Savior and Mediator of the whole human race, if they with full faith in him accept the grace proffered in Jesus; that this Jesus _ suffered and died on the cross for us, was buried, arose again on the third day, ascended into heaven, and sitteth on the right hand of God, to intercede for us ; and that he shall come again at the last day to judge the quick and the dead.
*99 We believe in the Holy Ghost; that he is equal in being with the Father and the Son, and that he comforts the faithful, and guides them into all truth.
We believe in a holy Christian Church, the communion of saints, the resurrection of the body, and life everlasting.
We believe that the Holy Bible, Old and New Testaments, is the word of God; that it contains the only true way to our salvation ; that every true Christian is bound to acknowledge and receive it with the influence of the Spirit of God, as the only rule and guide; and that without faith in Jesus Christ, true repentance, forgiveness of sins, and following after Christ, no one can be a true Christian.
We also believe that what is contained in the Holy Scriptures, to-wit: the fall in Adam and redemption through Jesus Christ, shall be preached throughout the world.
We believe that the ordinances, viz., baptism and the remembrance of the sufferings and death of our Lord Jesus Christ, are to be in use, and practiced by all Christian societies; and that it is incumbent on all the children of God particularly to practice them; but the manner in which ought always to be left to the judgment and understanding of every individual. Also, the example-of washing feet is left to the judgment of everyone to practice or not, but it is not becoming of any of our preachers or members to traduce any of their brethren whose judgment and understanding in these respects is different from their own, either in public or in private. Whosoever shall make himself guilty in this respect shall be considered a traducer of his brethren, and shall be answerable for the same.
This Confession of Faith was never submitted to the membership of the church for ratification, but continued to be the only Confession of Faith of said church until the meeting of the General Confei’ence in York, Pennsylvania, in May, 1889.
That General Conferences were held from time to time from the year 1815; and in 1837, at the General Conference held at Germantown, Ohio, William Rhinehart, the secretary of the body, presented for the consideration of the Conference, a constitution, which was unanimously adopted, and was the first constitution of the church. The conference, doubting *100 its power to adopt such instrument, issued a circular to the membership of the church as follows:

To the Members of the Church of the United Brethren in Christ throughout these United States :

Dear brethern, by whose authority we, as a General Conference, have been authorized to legislate on matters pertaining to the government of our church, and having long since been convinced of the great necessity of a constitution for the better regulation thereof, have, by unanimous consent, framed and established the foregoing. We are well aware that we have transcended the bounds given us by our Discipline, which will be found in the constitution, article IV, section 2, declaring that the said constitution can neither be altered nor amended without a majority of two-thirds of a General Conference. If there had been a general notice given to the church previous to the election of delegates that there would be a memorial offered to General Conference, praying them to adopt.a constitution, and to ratify it agreeably to article IV, section 2, then the General Conference would have had full power to have done so. The object of this circular is (feeling that the government of our church is not as firm as it ought to be), to give notice to our church throughout the Union that we intend to present a memorial to the next General Conference, praying them to ratify the constitution now adopted, according to article IV, section 2, in testimony of our ardent desire for the wellfare of our church, and the general spread of the gospel.
Written by order of General Conference, Germantown, Ohio, May 12, 1837.
Signed in behalf of the same, by
William R. Rhinehakt, Sec'y.
Article IV, referred to in said circular, reads as follows:
Section 1. If, at any time after passing this constitution, it should be contemplated either to alter or amend the same, it shall be the privilege of any member in the society to publish, or cause to be published, such contemplation at least three months before the election of delegates to the General Conference.
Section 2. No General Conference shall have the power to alter or amend the foregoing constitution, except it be by a vote of two-thirds of that body.
*101 Said constitution and circular were inserted in the Discipline issued next after this session of the General Conference, 7,750 copies of which were printed and circulated by order of the Conference among the membership.
The next General Conference met in Pickaway county, Ohio, in the year 1841, but took no action upon the constitution adopted by the General Conference in 1837, but adopted the following:
CONSTITUTION OF 1841.
We, the members of the Church of the United Brethren in Christ, in the name of God, do, for the perfecting of the saints, for the work of the ministry, for the edifying of the body of Christ, as well as to produce and secure a uniform mode of action, in faith and practice, also to define the powers and the business of quarterly, annual, and general conferences, as recognized by this church, ordain the following articles of Constitution.
ARTICLE I.
Section 1. All ecclesiastical power herein granted, to make or repeal any rule of discipline, is vested in a general conference, which shall consist of elders, elected by the members of every conference district throughout the society; provided, however, such elders shall have stood in that capacity three years, in the conference district to which they belong.
Section 2. . General Conference is to be held every four years; the bishops to be considered members and presiding officers.
Section 3. Each annual conference shall place before the society the names of all the elders eligible to membership in the General Conference.
ARTICLE II.
Section 1. The General Conference shall define the boundaries of the annual conferences.
Section 2. The General Conference shall, at every session, elect bishops from among the elders throughout the church, who have stood six years in that capacity.
Section 3. The business of each annual conference shall be done strictly according to Discipline ; and any annual conference acting contrary thereto, shall, by impeachment, be tried by the General Conference.
*102 Section 4. No rule or ordinance shall at any time be passed to change or'do away the Confession of Faith as it now stands, nor to destroy the itinerant plan.
Section 5. There shall no rule be adopted that will infringe upon the rights of any as it relates to the mode of baptism, the sacrament of the Lord’s Supper, or the washing of feet.
Section 6. There shall be no rule made that will deprive local preachers of their votes in the annual conference to which they severally belong.
Section 7. There shall be no connection with secret combinations, nor shall involuntary servitude be tolerated in any way.
Section 8. The right of appeal shall be inviolate.
ARTICLE III.
The right,- title, interest and claim of all property, whether consisting in lots of ground, meeting-houses, legacies, bequests or donations of any kind, obtained by purchase or otherwise, by any person or persons, for the use, benefit and behoof of the Church of the United Brethren in Christ, is hereby fully recognized and held to be the property of the church aforesaid.
ARTICLE IV.'
There shall be no alteration of the foregoing constitution, unless by request of two-thirds of the whole society.
This constitution, as well as said Confession of Faith, was inserted in the printed Discipline of that year, and of each succeeding quadrennium until 1889.
There was no submission of said constitution to the membership of the church for their approval; but it became operative by virtue of its adoption by the General Conference, and the acceptance and acquiescence therein by the membership and all the judicial' and legislative authorities of the church, and thus became the organic law of the church, and so remained until May 13, 1889.
General Conferences were held quadrennially from the year 1841 to 1889 inclusive. At a regular General Conference held at Fostoria, in May, 1885, a committee on revision, composed of thirteen members, and known as “ Committee No, *103 6,” was appointed to consider the Constitution and Confession of. Faith, and Section 3, Chapter X, of the Discipline. Subsequently, at the same session of the conference, said committee, by its report, recommended the creation of a church commission consisting of twenty-seven members, appointed . ’and elected by the conference, whose duty it should be to consider the existing Confession of Faith and Constitution of the Church, and prepare such form of belief and such amended fundamental rules for the government of the church as should in their judgment be best adapted to secure its growth and efficiency in the work of evangelizing the world; provided, (1) that the commission should preserve unchanged in substance the existing Confession of Faith, so far .as it was • clear. (2) That it should retain the then existing itinerant plan. (3) That it should keep sacred the general usages and • distinctive principles of the church on all great moral reforms .as sustained by the word of God, in so far as the province of their work might touch them.
Said report provided, that a majority of said commission should be necessary for the adoption of a Constitution and .Confession of Faith, to be submitted to the membership; that .such commission should meet at such time and place as the bishops might appoint, anjl was expected to complete its work by January 1, 1886 ; that it should adopt and cause to be ex- • ecuted a plan by which the proposed Confession of Faith and Constitution might receive the largest possible attention and -expression of approval or disapproval by the members of the church, including all necessary regulations for taking, reporting and counting the vote; and that when the result of the vote of the church showed that .tworthirds of all the votes • cast had been given in approval of the proposed Confession of Faith and Constitution, it should be the duty of the bishops to publish and proclaim the result through 'the official organs of the church; whereupon the Confession of Faith and •Constitution thus ratified should become the fundamental belief and organic law of the church. ' ...
*104 Eleven of the thirteen members of the committee signed this report, and also a separate report recommending a law upon the subject of secret combinations in place of section 3 of chapter X of the Discipline upon that subject.
A minority report, signed by two members of the committee, was made, in which it was denied that the General Conference had any power to alter or change the constitution without first securing the consent of the members of the church by a two-thirds vote, as required in article IV of the constitution.
The majority report was adopted by a vote of 78 for and 42 against; and subsequently, at the same session, the members of the Church Commission were chosen, as provided in the report. Also, at the same session, the following paper was introduced and ordered spread upon the records:
Whereas, We have assembled with this General Conference in good faith to promote its interests, and legislate in harmony with the constitution of the church ; and,
Whereas, We believe that this body, in its action in forming a commission for the revision of our Confession of Faith and the Constitution of the Church, has transcended its constitutional authority, and instituted an illegal plan (not the one provided in the constitution) for change, and legislated a rule not in harmony with the constitution, but equivocal and capable of varied construction, in order, as we think, to make it ineffectual and worthless; therefore, we determine to stand by the constitution, and never to submit to any change therein, unless it is effected in harmony with its provisions; and we hereby earnestly and solemnly protest against all such action.
Halleek Floyd, Milton Wright, J. M. Kabrich, W. H. Clay, J. L. Luttrell, Wm. Dillon, J. W. Lilley, H. T. Barnaby, W. H. Chandler, J. K. Alwood, A. B. Powell, D. A. Bowles, J. H. Grimm, H. A. Long, B. H. Mowers, A. W. Geeslin, D. B. Sherk, J. Fry, J. Breden, R. H. Watson, W. S. Spooner, A. J. Newgent, D. A. Beauchamp, William Miller, J. Noel, F. J. Crowder, Daniel Shuck, David Shuck, Geo. Plowman, John Riley, W. P. Caldwell.
It is further found, that pursuant to the above action of the General Conference, the Church Commission met in Dayton, *105 Ohio, on November 17, 1885, and formulated a Confession of Faith and an Amended Constitution, to be submitted to the membership of the church for approval or rejection.
Said revised Confession of Faith reads as follows:
In the name of God, we declare and confess before all men the following articles of our belief:
ARTICLE i.

Of God and the Holy Trinity.

We believe in the only true God, the Father, the Son, and the Holy Ghost; that these three are one — the Father in the Son, the Son in the Father, and the Holy Ghost equal in essence or being with the Father and the Son.
ARTICLE II.

Of Creation and Providence.

We believe this triune God created the heavens and the earth, 'and all that in them is, visible and invisible; that he sustains, protects, and governs these with gracious regard for the welfare of man, to the glory of his name.
ARTICLE III.

Of Jesus Christ.

We believe in Jesus Christ; that he is very God and man ; that he became incarnate by the power of the Holy Ghost, and was born of the Virgin Mary; that he is the Savior and Mediator of the whole human race, if they with full faith accept the grace proffered in Jesus; that this Jesus suííered and died on the cross for us, was buried, rose again on the third day, ascended into heaven, and sitteth on the right hand of God, to intercede for us; and that he will come again at the last day to judge the living and the dead.
ARTICLE IV.

Of the Holy Ghost.

We believe in the Holy Ghost; that he is equal in being with the Father and the Son ; that he convinces the world of sin, of righteousness, and of judgment; that he comforts the faithful and guides them into all truth.
*106 ARTICLE V.

Of the Holy Scriptures.

We believe that the Holy Bible, Old and New Testaments, is the word of God; that it reveals the only true way to our salvation; that every true Christian is bound to acknowledge and receive it by the help of the Spirit of God as the only rule and guide in faith and practice.
ARTICLE VI.

Of the Ohurch.

We believe in a holy Christian Church composed of true believers, in which the word of God is preached by men divinely called, and the ordinances are duly administered; that this divine institution is for the maintenance of worship, for the edification of believers, and the conversion of the world to Christ.
ARTICLE VII.

Of the Sacraments.

. We believe that the sacraments, baptism, and the Lord’s Supper, are to be used, in the church, and should be practiced by all Christians; but the mode of baptism and the manner of observing the Lord’s Supper are always to be left to the judgment and understanding of each individual. Also, the baptism of children shall be left to the judgment of believing. parents.
The example of the washing of feet is to be left to the judgment of each one, to practice or not.
ARTICLE VIII.

Of Depravity.

. We believe that man is fallen from original righteousness, and apart from the grace of our Lord Jesus Christ, is not only entirely destitute of holiness, but is inclined to evil, and only evil, and that continually; and that except a man be born again, he cannot see the kingdom of heaven.
ARTICLE IX.

.Of Justification.

We believe that penitent sinners are justified before God, only by faith in our Lord Jesus Christ, and not by works ; *107 yet that good works in Christ are acceptable to God, and spring out of a true and living faith.
ARTICLE X.

Of Regeneration and Adoption.

We believe that regeneration is the renewal of the heart of man after the image of God through the word, by the act of the Holy Ghost, by which the believer receives the spirit of adoption and is enabled to serve God with the will and the affections.
ARTICLE XI.

Of Sanetifieation.

We believe that sanctification is the work of God’s grace, through the word and the Spirit, by which those who have been born again are separated in their acts, words, and thoughts from sin, and are enabled to live unto God, and to follow holiness, without which no man shall see the Lord.
ARTICLE XII.

Of the Christian Sabbath.

We believe that the Christian Sabbath is divinely appointed; that it is commemorative of our Lord’s resurrection from the grave, and is an emblem of our eternál rest; that it is essential to the welfare of the civil community, and to the permanence and growth of the Christian chnrch, and that it should be reverently observed as a day of holy rest and of social and public worship.
ARTICLE XIII.

Of the Future State.

We believe in the resurrection of the dead; the future general judgment; and an eternal state of rewards in which the righteous dwell in endless life, and the wicked in endless ’ punishment. .
And said amended Constitution as follows:
In the name of God, we, the members of the Church of the United Brethren in Christ, for the work of the ministry, for the edifying of the body of Christ, for the more speedy and effectual spread of the Gospel, and in order to produce *108 and secure uniformity in faith and practice, to define the powers and business of the- General Conference as recognized by this church, and to preserve inviolate the popular will of the membership of the church, do ordain this constitution s
ARTICLE i.
Section 1. All ecclesiastical power herein granted, to enact or repeal any rule or rules of Discipline, is vested in a General Conference, which shall consist of elders and laymen elected in each annual conference district throughout the church. The number and ratio of elders and laymen, and the mode of their election, shall be determined by the General Conference.
Provided, however, that such elders shall- have stood as elders in the conferences which they are to represent for no less time than three years nex;t preceding the meeting of the General Conference to which they are elected; and that such laymen shall be not less than twenty-five years of age, and shall have been members of the church six years,, and members in-the conference districts which they are to represent at least three years next preceding the meeting of the General Conference to which they are elected.
Section 2. The General Conference shall convene every four years, and a majority of the whole number of delegates-elected shall constitute a quorum.
Section 3. The ministerial and lay delegates shall deliberate and vote together as one body; but the General Conference shall have power to provide for a vote by separate orders whenever it deems it best to do so ;• and in such cases the concurrent vote of both orders shall be necessary to complete an action.
Section 4. The General Conference shall, at each session,, elect bishops from among the elders throughout the church,, who have stood six years in that capacity.
Section 5. The bishops shall be members ex offioio and presiding officers of the General Conference; but in case no bishop be present, the Conference shall chose a president pro tempore.
Section 6. The General Conference shall determine the number and boundaries of the annual conferences.
- Section 7. Tne General Conference shall have power to review the records of the annual conferences, and see that the business of each annual conference is done strictly in ac *109 cordance with the Discipline, and approve or annul, as the' case may require.
Section 8. The General Conference shall have full control' of The United Brethren Printing Establishment, The Home,. Frontier, and Foreign Missionary Society, The Church-Erection Society, The General Sabbath-School Board, The Board's of Education, and Union Biblical Seminary. It shall also' have power to establish and manage any other organization or' institution within the church which it may deem helpful in. the work of evangelization.
Section 9. The General Conference shall have power to'establish a court of appeals.
■ Section 10. The General Conference may — two-thirds of the members elected thereto concurring — propose changes in, or additions to, the Confession of Faith; provided, that the ooncurrence of three-fourths of the annual conferences shall be necessary to their final ratification.
ARTICLE II.
The General Conference shall have power, as provided in-article I., section 1, of this Constitution, to make rules and: regulations for the church; nevertheless, it shall be subject to-the following limitations and, restrictions :
Section 1. The General Conference shall enact no rule or ordinance which will change or destroy the Confession of Faith; and shall establish no standard of doctrine contrary to-the Confession of Faith.
Section 2. . The General Conference shall enact no rule which will destroy the itinerant plan.
Section 3. The General Conference shall enact no rule which will, deprive local preachers of their votes in the annual conferences to which they severally belong.
Section 4. The General Conference shall enact no rule-which will abolish the right of appeal.
ARTICLE III.'
Section 1. We declare that all secret combinations which-infringe upon the rights of those outside their organization, and-whose principles and practices are injurious to the Christian characters of their members, are contrary to the word of God, and that Christian sought to have no connection with them.
. The General Conference shall have power to enact suck *110 •rules of discipline with respect to such combinations as in its judgment it may deem proper.
Section 2. Wc declare that human slavery is a violation of human rights, and contrary to the word of God. It shall .therefore in no wise be tolerated among us.
ARTICLE IV.
The right, title, interest, and claim of all property, both real and personal, of whatever name or description, obtained by purchase or otherwise, by any person or persons, for the use, benefit, and behoof of the Church of the United Brethren in Christ, are hereby fully recognized, and held to vest in the .church aforesaid.
ARTICLE V.
Section 1. Amendments to this constitution may be proposed by any General Conference — two-thirds of the members elected thereto concurring, — which amendments shall be submitted to a vote of the membership throughout the church, under regulations authorized by said Conference.
A majority of all the votes cast upon any submitted amendment shall be necessary to its final ratification.
Section 2. The foregoing amended constitution shall be in force from and after the first Monday after the second Thursday of May, 1889, upon official proclamation thereof by the Board of Bishops; provided, that the General Conference elected for 1889 shall be the lawful legislative body under the amended constitution, with full power, until its final adjournment, to enact such rules as this amended constitution authorizes.
It is further found, that the Church Commission fixed a plan for the submission of said proposed amendments to a vote ■ of the church, by which it was provided :
1. The Confession of Faith, as a whole, should be submitted to the vote of the church. Those favoring its adoption should have written or printed on their ballots the words, • “ Confession of Faith, Yes ”; those opposed, the words, “Confession of Faith, No.”
2. The amended constitution as a whole should be sub- . mitted to a vote of the church, with the following exceptions :
*111 Article I, in so far as it relates to lay delegation in the General Conference, should be voted upon separately. Those favoring its adoption should have written or printed on their' ballots, “ Lay Delegation, Yes ”; those opposed to its adoption, the words, “ Lay Delegation, No.”
Also, section 1 of article III should be submitted separately. Those favoring its adoption should have written or-printed on their ballots the words, “ Section on Secret Combinations, Yes.” Those opposed to its adoption should have written or printed on their ballots the words, “Section on Secret Combinations, No.”
It was further provided, in said plan of submission, that those favoring the adoption of the remaining parts of the constitution, should have upon their ballots the words, “Amended Constitution, Yes”; and those opposed to such adoption should have upon their ballots, “Amended Constitution, No.”
It was further provided by said plan of submission, that the vote on said proposed revised Confession of Faith and Amendr ed Constitution should be taken in November, 1888, no day for taking the same being designated ; that necessary tickets and return blanks should be furnished by the publishing agent to each presiding elder three months prior to the time of voting; and that such presiding elder should at once distribute such supplies to the pastors in his district in proportion to the membership of each charge; and that each pastor should distribute the same to the several societies in his charge at least ten days before the time of voting.
Said plan also provided that—
1. The pastor, leaders, and stewards of each society shall’ constitute a Local Board of Tellers, who shall, on the day of voting, enroll the names of all those who vote, and shall receive no votes except those presented in person by the members on the day fixed by the Local Board of Tellers'; provided, however, should any member be incapacitated by age or affliction to attend such meetings, and should any minister be ab *112 sent on his charge, they may send their ballots with their names signed on the back thereof.
2. The Local Board of Tellers shall preserve the list of voters and ballots for one year after the results of this vote are ■announced to the church by the Board of Bishops.
3. It shall also be the duty of each Local Board of Tellers immediately to make a full report of the vote taken, on a blank provided for this purpose, to its Annual Conference Board of Tellers.
Each Annual Conference, at its session next preceding the time of voting, shall elect a Conference Board of Tellers, which shall receive the returns from the local boards of tellers in the bounds of the Conference, and shall count and transmit a full and accurate report of the same, on blank sheets provided, to the General Board of Tellers, on or before January 1, 1889.
In case of the refusal or neglect of the presiding elder or Annual Conference to comply with these instructions, any pastor, leader, or steward may apply to the publishing agent at Dayton, Ohio, for the necessary supplies, and may proceed, according to section III, to take a vote of his class on the proposed amendments, and make his returns direct to the General Board of Tellers.
J. Weaver, G. A. Funkhouser, L. Bookwalter, D. L. Rike, W. J. Shuey, J. A. Shauck, and H. Garst shall be a General Board of Tellers (post office, Dayton, Ohio), who shall receive the reports from the Annual Conference Boards of Tellers, and shall count and make a full and accurate report of the same to the Board of Bishops not later than the ,15th of January, 1889.
The Board of Bishops were directed to prepare an address to the. church upon the work of the commission, to be published through the official newspaper of the church, the Religious Telescope, and otherwise; which was done in January, 1886, and the address, together with the Commission Act, Plan of Submission, and proposed Confession of Faith and Constitution, was at once distributed throughout the church. Ample notice was given to all the members of the church, except to those in Africa and Germany, of the time, manner, and purpose of the vote.
*113 It is further found, that during the month of November, ■1888, the .vote was taken — the form of the ballot furnished and used being as follows: ' .
1888.
UNITED BRETHREN IN CHRIST. BALLOT
On Amendments to the Confession of Faith and Constitution.
Members wishing to vote NO on either propo • -sition must erase the word YES and insert NO.
Confession of Faith....................YES.
Amended Constitution...........,.....YES.
Lay Delegation..........................YES.
Section on Secret Combinations.....YES.
And that the votes were counted and canvassed by the several boards of tellers, as provided in the plan of sub-» mission, and the result declared by the .General Board of Tellers on the 15th day of January, 1889, and published in .the Religious Telescope on the 6th day of February, 1889, as follows:
For the Confession of Faith.....................51,070
Against the Confession of Faith................. 3,310
For the Amended Constitution.................,50,685
Against the Amended Constitution.............. 3,659
For Lay Delegation................................48,825
Against Lay Delegation...................... 5,634
For Section on Secret Combinations............46,994
Against Section on Secret Combinations...... 7,298
That the total number of votes cast for and against the several propositions was...........54,369
It is further found, that in 1888 the enrolled membership of the church was about 204,517, including 720 members in *114 Germany and 4,720 in Africa, said enrollment having been made by the ministers of the church under a rule of the Discipline ; and that at the election, held in November, 1888, on different days in different localities throughout the church, for delegates to the General Conference to meet in May, 1889, and at which election the entire membership, regardless of age or sex, were entitled to vote, the total number of votes cast was 58,839, the largest vote ever cast by the church; that the proclamation of the vote above stated was signed at Chambersburg, Pennsylvania, May 6, 1889, by all the bishops save one, who was present but declined to sign; and that the same was published in the official organs of the church as required by said plan of submission, May 13, 1889.
It is further found, that a General Conference of the church, composed of 131 delegates, duly elected under the laws, rules, and regulations of the church, met at York Opera House, in York, Pennsylvania, on Thursday, May 9, 1889; that in the Bishop’s Quadrennial Address was the following on the subject of the Church Commission :
By the action and authorization of the General Conference of May, 1885, a Church Commission was convened on the 17th day of the following November, in Dayton, Ohio, to take under consideration the Confession of Faith and Constitution of the Church, and to prepare such a form of belief and such amended fundamental rules for its government in the future as would, in their judgment, be best adapted to secure its growth and efficiency in the work of evangelizing the world. After six days’ deliberation upon these grave interests, to which were given the largest wisdom, the wisest thought, the closest scrutiny, and the most pious judgment within the capabilities of the commission, a report was unanimously agreed upon, and in November last, by the largest expression ever obtained in the denomination, was adopted, the vote being in excess of a two-thirds majority.
We refrain from argument in support of what was done, but may be allowed some general statements to you upon a question of such wide and general interest to the church as the one now challenging your most godly consideration.
It is sadly known throughout the church that there has *115 been for a time a growing friction along the line of wbat has-been known as the organic law of the church. Two antagonistic views have obtained and found ample- advocacy in the past. The one is, that we have a valid constitution, of absolute and unquestioned force, binding on all the members of the church, and also so bounding, restricting and-limiting the action of the General Conference itself, that it cannot legislate along certain lines nor adopt certain measures, well defined in the limiting terms of the constitution, without being guilty of usurpation and revolution. The other view is, that the General Conference, being a constitutional body, has judicial powers, is capable of judicial action, and hence, being the highest anthority known in the jurisprudence of the church, may, by right, adjudicate questions of dispute, interpret and construe law, as well as devise and formulate plans for the furtherance of its benevolent designs and its mission of mercy among men.
It is furthermore held that the restrictions which have been supposed to form an impassable barrier to the authority of the General Conference, are so far-reaching in their demands, and so ambiguous in their meaning, as to render them utterly untenable in a day of advanced thought and of expanding measures. It has been in a measure demonstrated that a feature of absolute immutability has been impressed on her constitution, so that its amendment, according to its own terms, is an utter impossibility. This absolutism in our system, this inflexibility of provision for amendment, is being regarded, in the light of recent experience, as exceedingly unfortunate. While any change in fundamental principles should be rendered difficult of accomplishment, yét some flexibility should obtain in relations where the knowledge of actors is imperfect and their judgment confessedly fallible.
Now, while one view or line of interpretation, if pushed to the utmost limit of a literal construction, would make any change whatever utterly impossible, and while the other view, if expanded to the proportions of the most liberal construction possible, would make questionable inroads upon our fundamental principles, we must, avoiding these extremes, seek the happy mean between so much conservatism, on the one hand, that any change is impossible; and so much flexibility, on the other hand, that organic law has no sufficient safeguard.
Certainly a church constitution should have some possible *116 method of procedure by which it could be amended. That those who gave us the constitution intended to put it practically beyond the possibility of alteration or modification, has never been insisted upon. Aud yet the church found itself in this very attitude when it came to meet a growing demand •for more pliant and equitable measures arising from the exigencies of the times.
With a view of divesting this subject of all ambiguity, extirpating all doubt, and thus avoid possible perplexing difficulties in the future, this whole matter was submitted to this commission, where it found full and careful expression, and then went to a vote of the church with such a result as will -come to your notice and consideration by the official report to be hereafter submitted.
Beloved brethren, this may be the crisis period in the history of the church. You will weigh well what has been done. The Church of God is your priceless heritage. It is the purchase of the precious blood of Christ. As the chosen representatives of a Christian people, whose views and wishes you are supposed to reflect, you can afford to bid utter defiance to self and to selfish ends. Youa re representatives. The church of the latter part of the nineteenth century has ■called you to conserve what to her is precious and priceless— soundness of doctrine and clearness of expei'ience. These preserved, the- ancient landmarks still remain. New worlds await your conquests, unknown regions await your invasion, if you are men of cultured brain and consecrated heart. We may be aggressive without being ecclesiastical vandals; we .may be conservative without being religious bigots.
True reformers and true conservatives \valk hand in hand. Their goal is the same. They differ only in method, not in purpose ; in head, not in heart. The one is not the enemy of progress, the other is not the enemy of conservation, yet either is liable to so judge the other. “ Judge not that ye be not judged.”
As ministers, representative men, we can be active without becoming bitter partisans, be conservative without becoming .stoical, and be progressive without becoming fhnatical.
Your action will he decisive. Well may you tremble in the presence of the greatness of the work to be done. The voice of history both warns and cheers. Be cautious, but not faltering; brave, but not rash; firm, but not captious. *117 The future of this church, as well as the cause of God in general, will be helped or hindered by what we do. “ Quit you like men, be strong.”
That on Friday, May 10, 1889, being the second day of the said General Conference, said body adopted a rule declaring a majority to be a quorum for the transaction of business; that on the second day of the Conference said Church Commission submitted to the Conference a report of its work in connection with the amended Constitution and revised Confession of Faith, embodying in said report the said Constitution and Confession of Faith, the plan of submission, the Bishops, address, and the action and vote of the members of the church upon the said several propositions submitted ; that this report was referred to a special committee of seven, with instructions to report to the Conference whether the commission had acted in compliance with instructions of the General Conference, and whether the vote of the church had been orderly and regular, and also to recommend to the Conference such action as it might deem proper to be taken in the premises.
Five of this committee submitted a report to the Conference, May 11, 1889, approving the work of the Commission and recommending the adoption of the following resolutions :
Resolved, 1. By the General Conference of the Church of the United Brethren in Christ, in quandrennial session assembled in the city of York, Pennsylvania, May 9, 1889, that the recorded proceedings of the Cemmission, including the Revised Confession of Faith and amended Constitution, as formulated and submitted to the vote of the church, together with the methods of submission and all other acts by which the will of the church was ascertained thereon, are hereby approved and confirmed.
2. That because of the truth that the revised Confession of Faith and aprended Constitution as a whole, and all the sepaarate propositions' thereof, submitted to the membership of our church, have been adopted by more than the required two-thirds of all the votes cast thereon, as required by the General *118 Conference in 1885, it is hereby declared and published by this Conference, and for itself, that the said revised Confession of Faith and amended Constitution, and framed and submitted by the lawfully' constituted Commission of the Church, are become the fundamental belief and organic law of the Church of the United Brethren in Christ, and will be in full force and effect on and after the 13th day of May, A. D. 1889, upon the proclamation of the bishops, as provided and ordered in such amended Constitution.
A minority report, signed by two members of the committee, alleging divers irregularities in the work of the Commission, and suggesting that the Conference submit such amendments to the constitution to the vote of the people as it might deem wise and prudent, which should be regarded as a petition for such proposed changes, was submitted.
The majority report was adopted by a vote of one hundred and ten yeas to twenty nays.
It is further found, that on the 13th day of May, 1889, there was read in the General Conference the proclamation of the Board of Bishops, signed by J. Weaver, J. Dickson, N. Castle, E. B. Kephart, and D, K. Flickinger, regular bishops of said church, publishing and proclaiming the result of the vote of the church, in accordance with the provisions of the General Conference of 1885, as published in the Religious Telescope; and announcing further, that the result of said vote being the required two-thirds, they did thereby “ publish and proclaim the document thus voted upon to be the Confession of Faith and Constitution of the Church of the United Brethren in Christ, and we hereby pass from under the old, and legislate under the amended Constitution.” It is further found,,that the regular publication day of the Religious Telescope would have occurred on the 15th day of May, 1889, but fort hat week it was published on the- 13th of May, and on said last-named day said proclamation was read in the General Conference.
It is further found, that on said day, to-wit: Monday,. May 13, 1889, being the fourth business day of said session *119 of the Conference, after the said Bishops’ Proclamation had been read to the Conference, fifteen of the twenty members voting against the report of the committee upon the report of the commission, and who had up to that time participated in the deliberations of the Conference, withdrew from the York Opera House, where the Conference was being held, and, with fifteen alternates, met in a body, under the chairmanship of Milton Wright, who had been elected a bishop of the United Brethren Church at the General Conference of 1885, in the Park Opera House, in York, and after organizing, adopted a paper, stating, in substance, that inasmuch as 110 of the delegates and members of the General Conference did, on the 11th day of May, 1889, vote to adopt a new Constitution and Confession of Faith; and did, on the 13th day of May, 1889, through the presiding bishop, declare the same in force, thereby forming a new church; therefore, they were declared to have thereby vacated their seats as memTbers of the General Conference of the Church of the United Brethren in Christ.
This body met daily until the following Saturday, May 18, 1889, when it adjourned sine die.
It transacted business pertaining to the affairs of the church, and among other things elected the defendants, Halleck Floyd, Lewis Davis, George Horine, C. S. Miller, Aaron Zehring, J. A. Brown, and C, H. Kiracofe, trustees of the printing establishment of the United Brethren in Christ, and Milton Wright, publishing agent. It claimed to be the true General Conference of the United Brethren in Christ, and declared its adherence to the old Constitution and Confession of Faith.
This body and those acting with them have since been known as the “ Radicals ” or “ Conservatives,” while those adhering to the revised Confession of Faith and the amended Constitution are known as “ Liberals.”
It is further found, that after the withdrawal of said members, the Conference sitting in York Opera House continued its sessions until May 21, 1889, when it adjourned without *120 day; that before that, to-wit: on the 14th day of May, 1889, it adopted a resolution reciting that, whereas certain delegates, named, had actively participated in the proceedings of that body from its organization to the close of the third day’s session, and had then vacated their seats and formed another church, outside and separate and apart from the place properly and officially occupied by the lawfully elected General Conference of the church, the said persons had irregularly withdrawn from that body and from the church, and were, in view of such action, no longer ministers or members of the Church of the United Brethren in Christ. It also adopted certain rules concerning insubordination of members of the church, and transacted other business, among which was the election pf the plaintiffs herein as trustees of the printing establishment of the United Brethren in Christ, and W. J. Shuey, publishing agent.
It is further found, that there were presented to the General Conference of 1889, petitions from forty-one Conferences of the church, the names thereto aggregating 16,187, asking the General Conference not to make any change in the Constitution and Confession of Faith; that said petitions had been in circulation for about three years, and contained, at the time of their presentation to the General Conference, the names of some persons who were dead, of some who were not members of the church in good standing, and the names of others who voted for the amended Constitution and revised Confession of Faith.
It is further found, that those designated as “ Radicals ” have since the General Conference of 1889, adhered to the old Confession of Faith and the old Constitution, and rejected the revised Confession of Faith and the amended Constitution ; that those known as “ Liberals ” accept the revised Confession of Faith and the amended Constitution, and since their adoption have conformed thereto and and acted thereunder ; that both Radicals and Liberals keep up church organizations, and each party has worn-out preachers entitled (if it *121 be the true church) to share in the surplus funds of the printing establishment.
It is further found, that since the General Conference of' 1889, the doctrine and beliefs preached and taught by both “Liberals” and “Radicals” in no wise differ from those-preached and taught by the Church of the United Brethren in. Christ prior to said General Conference. Alll the distinctive principles, ceremonies, usages, and customs have been retained and practiced in the Church by the “ Liberals ” as-fully and strictly as was done before the adoption of the revised Confession and amended Constitution, except that they have admitted to membership in the church members of secret organizations.
It is further found, that said amended Constitution and. Confession of Faith were adopted by the General Conference of the church, upon the request of the requisite number of the membership, and in good faith; that said revised Confession of Faith is not antagonistic to the doctrines, faith, or belief of the church as they existed at the date of the several conveyances in the petition mentioned, or since; that there is no substantial or material difference between the old and new Confessions of Faith.
It is further found, that the first charter of the Printing Establishment was a special act of the General Assembly of' March 16,1839 (Local Laws of Ohio, vol. XXXVII., p. 259). It provided for the election of trustees agreeably to rules and regulations of the Church of the United Brethren in Christ, who were by said act declared to be a body corporate and politic, with succession for thirty years, by the name of “ The Trustees of the Conference Printing Establishment of the United Brethren in Christ, in the Town of Circleville, Pick-away County, Ohio,” and capable of suing and being sued in all courts. Said corporation was authorized to have a common seal, and to ordain and establish by-laws, rules, and regulations for the government and well-being of said establishment, and whs vested with power to have and hold by pur— *122 • chase, gift, donation, or bequest, any estate, real, personal and mixed, necessary for the welfare of the establishment, and the same to grant, sell, or dispose of at pleasure : Provided, that the proceeds of any and all property held by said corporation, shall never at any time exceed the sum of ten thousand dollars per annum. Said act declared the sole object of said corporation to be the publication of a religious periodical and such other works as may conduce to the general benefit of . said churchthe net proceeds of the corporation to be divided equally among all the Annual Conferences of said : church in the United States, to be applied to the support of their ministry.
Subsequently, in the year 1869, at the General Conference held in Lebanon, Pennsylvania, James Applegate, Jacob Hoke, Daniel E. Flickinger, David L. Rike, and Thomas N. Sowers were elected trustees of such printing establishment, and accepted said election ; and in the year 1871, a certificate of such election, signed by the secretary of said Conference was, together with the written acceptance of said trustees, filed and recorded in the recorder’s office of Montgomery county, Ohio; and the real estate described in the petition and cross-petition was conveyed to the trustees of the printing establishment of the United Brethren in Christ by deeds of purchase, dated respectively in the' years 1853, 1873, 1884, and 1885. The surplus funds of said printing establishment, over and above expenses, are applicable to the support of worn-out and superannuated preachers.
It is further found, that said election of the said plaintiffs as trustees and of said Shuey as such publishing agent, was had in all respects as required by the rules and regulations of the church; and that said plaintiffs and said Shuey severally . accept the amended Constitution and revised Confession of Faith, and claim to be acting under and in accordance with the same.
Such is our finding of facts. The next inquiry is as to the . conclusions of law to be deduced therefrom.
*123 Much time has been devoted by counsel to the history and legislation of the United Brethren Church from its foundation in the last century, interesting and instructive,- but of little value as an aid to the solution of the questions involved in this controversy.
We have found the constitution of 1841 to be valid organic-law from the time of its adoption until May 13, 1889, at which time the change was made, the validity of which the defendants challenge. That instrument provides (Article II, Section 4) that “No rule or ordinance shall at any time be passed,, to change or do away the Confession of Faith as it now stands, nor to destroy the itinerant plan; ” and Article IV ordains, that “ There shall be no alteration of the foregoing-constitution, unless by request of two-thirds of the whole society.”
Was there such request ? The constitution is silent as to the method by which this “request” shall be preferred, leaving the Conference to suggest, or the people to adopt, any form of request they may deem proper. The General Conference appointed a commission to formulate an amended Constitution and a revised Confession of Faith, and provided that such commission should “ adopt and cause to be executed a plan by which such measures should receive the largest possible attention and expression of approval or disapproval by our people,” etc.
The largest publicity was given to the pendency of these measures through the official organs of the church, by pamphlets, from the pulpit, and otherwise, as well as of the time when the vote would be taken. Ballots were prepared and circulated throughout the membership, and every means adopted to secure a full expression of the views of the membership upon the proposed changes.
Following this, after a three years’ canvass, came the election, at which an extraordinarily large vote was cast.
In pursuance of the plan of the Conference in that behalf,. *124 returns of the vote were made from the Annual Conferences to the General Board of Tellers, at Dayton, Ohio, and that board in turn prepared and returned to the Board of Bishops a consolidated abstract of the vote, which showed a majority in favor of the aiüendments, largely in excess of two-thirds of the votes polled, even if the 16,187 members protesting, but not voting, were counted as voting “ No.”
Was not this almost unanimous vote in favor of the proposed amendments a “request” ? Was it necessary that the “ request ” should proceed from the membership without any suggestion from any quarter that it be made ? Why might not the Conference advise or suggest that such “ request ” be made ? No reason occurs to us why it might not, nor why a request so made would be unconstitutional.
The objection on this score is more technical than substantial. The vote was a “request.”
But defendants say, conceding said request to be sufficient, the Constitution required it to be by “ two-thirds of the whole society.”
But what should be the construction of the phrase, “ two-thirds of the whole society?” Does it mean two-thirds of the entire number borne upon the church rolls as members? Or does it mean two-thirds of those voting?
We do not think the fathers who ordained the Constitution of 1841 intended to follow the example of the Medes and Persians, and fetter future generations for all time, unless two-thirds of all the members, men, women, children, non-communicants, those “ beyond sea,” African converts, and all, should request the change. Such construction can hardly be insisted upon, in the light of the testimony that the church was opposed to “ numbering Israel ” at the time of the adoption of the Constitution of 1841, and for many years after-wards.
The framers of the rule must have meant that two-thirds of those voting should be sufficient; otherwise, how were they to determine that the requisite majority had voted for or *125 against a measure, there being no provision for an enumeration, and the church being opposed to making one ?
We are bound to assume that the rule was made in the light of the fact that enumérations were not favored, and that, therefore, the phrase was used in its generally accepted sense — two-thirds of those voting.
The Constitution of 1837 provided, that “No General Conference shall have power to alter or amend the foregoing constitution, except it be by a vote of two-thirds of that body.”
Under this limitation, could not the General Conference, by a vote of two-thirds of a quorum, change the organic law, although strictly the phrase, “two-thirds of that body,” means two-thirds of all the members of that body ? We think so. And so the phrase, “two-thirds of the members of the whole society,” .while i-t literally signifies two-thirds of all the members of the church, means, in the sense in which it is used in the Constitution of 1841, two-thirds of those members who vote.
In Corrol County v. Smith, 111 U. S. 556, which concerned an election held under a statute of Mississippi, authorizing subscriptions to the capital stock of a railroad company by muni-, cipalities, upon certain conditions, among which was the submission of the question “to the qualified voters of said county, city, etc., * * *’ * and if two-thirds of the qualified' voters vote in favor of the subscription, * * * * the constituted authorities * * * * are authorized and required to subscribe,” etc., Mr. Justice Matthews held, that an assenting vote of two-thirds of the whole number enrolled as. qualified to vote was not required, but that two-thirds of those actually voting at the election was sufficient.
And in Walker v. Oswald, 68 Md. 146, the court say:
When an election is held at which a subject-matter is to be-determined by a majority of the voters entitled to cast ballots-thereat, those absenting themselves, and those who, being-present, abstain from voting, are considered as acquiescing in. the result declared by a majority of those actually voting, even, though, in point of fact, but a minority of those entitled to. vote really do vote.
*126 See also St. Joseph v. Rogers, 16 Wall. 663; Wardens of Christ Church v. Pope, 8 Gray, 140-43; Richardson v. Society, 58 N. H. 188; Green v. Weller, 32 Miss. 850; Prohib. Amen't Cases, 24 Kans. 200; Dayton v. St. Paul, 22 Minn. 400; Miller v. English, 24 N. J. L. 17; County of Cass v. Johnston, 95 U. S. 360; 72 Ill. 63; 1 Sneed, 690; 10 Minn. 85; 37 Mo. 270; 69 Ind. 505; 20 Amer. Corp. Cases, 93; McCrary on Elections, 173.
But we are not confined to secular authority; for in accord with the above cases is the interpretation of the constitution by the General Conference, the court of last resort of the church. That it construed the phrase “whole society” to mean those voting upon the changes, is apparent from the pro-_ vision in the plan of submission that said changes should be held to be adopted when two-thirds of the members who voted upon them were found to have voted affirmatively. And the .approval by the General Conference of 1889 of the report of the commission, which set out the vote upon the changes, is .an affirmance of such interpretation.
It being clear that a majority of two-thirds of those voting was sufficient for the adoption of the amended Constitution ■and the revised Confession of Faith, the next question is, whether the adoption of the latter operated to “ change or do away the Confession of Faith ” as it stood prior to the revision.
This question must be answered in the negative. Changes have been made; but in no material or substantial respect. They consist in alterations of phraseology without changing the sense, and in the addition of statements of doctrine ' which have been taught and believed by the church from its foundation, and which, while not expressed in the old, are ■comprehended by implication. No new doctrine is introduced, no old dogma or article of faith is eliminated. The revised Confession involves no departure from the faith of the church .•as taught from the beginning.
That the old Confession of Faith permitted latitudinarian- *127 ism, while the new is more explicit and inflexible, is urged as a reason why we should hold that there has been a departure from the standards of the church, so serious as to destroy its identity.
But, as we have seen, there is no statement of doctrine in the new Confession which has not always been taught and believed by the church; and as a creed is a mere system of principles professed or believed, we can perceive no impropriety in expressing in orderly form those principles which, although believed and accepted as distinctive doctrine, are not formulated, or, if stated, are crude or equivocal.
If the revised Confession makes no change in the doctrines of the church, it is not to be condemned for its greater certainty and perspicuity as compared with the creed which it supplants. Obscure and equivocal language may be commendable in a political platform, but should find no place in • articles of religious faith.
We cannot assent to the claim of counsel that the concession that the new Confession differs from the old involves the admission that the new establishes different doctrine. Mere verbal changes do not necessarily alter the doctrine; neither does the expression in the new Confession of that which is implied in the old, have that effect.
One of the defendants, upon his examination, admitted that the doctrines stated in the revised Confession of Faith are not ■ unscriptural, nor antagonistic to the teachings of the church prior to the separation. Yet it is contended, that there have been seven omissions oí doctrine — five alterations directly, ■ and others indirectly — and twenty additions. Among the seven “omissions” is the “ disciplinary rule against traducing brethren.” No knowledge of theology is necessary to understand that rules of polity have no proper place in a creed or confession of faith. The remaining six “omissions” are not apparent from a comparison of the two creeds. The doctrines supposed to be omitted are fairly implied in the new Confession.
*128 Without further illustration, we are clear, as we have already said, that no substantial or material changes have been made in the creed of the church. The efforts of those learned in theology to bring to light essential differences, savor more of the ecclesiastical hair-splitting of the era of polemics and scholasticism, than of these days of advanced thought and practical Christianity.
But if our conclusions in this regard are wrong, is not the decision of the General Conference, the supreme judicatory of the church, conclusive?
Controversies in the civil courts concerning the property rights of that class of religious societies to which the Church of the United Brethren in Christ belongs, namely, the class haying an ascending series of judicatories, such as official boards, Quarterly Conferences, Annual Conferences and a General Conference, are to be decided, where the title is held by purchase, by reference to this proposition : That where the right of property in the civil court is dependent on the question of doctrine, discipline, ecclesiastical law, rule, custom or church government, and that has been decided by the highest tribunal within the organization to which it has been carried, the civil court will accept that decision as conclusive, and be governed by it in its application to the case before it. Watson v. Jones, 13 Wall. 679, 727.
The doctrine just stated seems to answer affirmatively the question above propounded. This controversy grows out of questions of purely ecclesiastical cognizance; and the General ■ Conference, having jurisdiction by virtue of the request of two-thirds of the whole society, decided them adversely to the defendants, and such decision is final and conclusive. Connit v. Ref. Prot. Dutch Ch., 54 N. Y. 551; Watkins v. Wilcox, 66 N. Y., 654; Chase v. Cheney, 38 Ill., 511; White Lick Qvaker Case, 89 Ind., 136 ; Harrison v. Hoyle, 24 Ohio St. 254; 45 Pa. St. 1; 45 Mo. 183; Gaff v. Greet, 88 Ind. 122; Shannon v. Frost, 3 B. Mon. 253; Gibson v. Arm *129 strong, 7 B. Mon. 481 Harmou v. Dreher, 1 Speer’s Eq. 87; High on Injunctions, secs. 310, 314.
Gunckel & Rowe and J. A. McMahon, for plaintiffs.
William Lawrence, George W.. Souk, and Young & Yov/ng, ¿for defendants.
It follows, also, from what we have said, that there has been no perversion of the trusts vested in plaintiffs. Such perversion, to entitle the party alleging it to relief, must be clearly shown: it must be a plain and radical departure. Gable v. Miller, 2 Denio, 492, 548; 66 N. Y. 654; 38 N. H. 460; 33 Ill. 398; 61 Ill. 405; 41 Pa. St. 13.
Other questions have been discussed, but they are not deemed material to the decision of the case.
It follows, and we state as conclusions of law, that the plaintiffs are the lawful trustees of said printing establishment ; and that said Shuey is the duly elected and qualified publishing agent of said church; that said plaintiffs as such trustees are entitled to the possession, management, and control of said real and other propeoty in the petition described, and to have the title thereto quieted in them and their successors, against the said adverse claims of said defendants and each and every of them.
That said defendants have not, nor has any of them, any right, title, or claim to the possession, management, or • control of any of the property aforesaid, as trustees or otherwise, nor to any of the proceeds thereof; and they and their successors ought to be forever restrained and enjoined from in . any wise interfering with the plaintiffs as trustees and the said Shuey as publishing agent, or their successors, in the posses- . sion, management, and control of said property, or the proceeds thereof.
That said defendants are not, nor is any of them, entitled to ■ any relief sought by them, or any of them, herein, and their -cross-petition will be dismissed at their costs.
Decree accordingly.